| | | |
|---|---|---|
| HIGHER EDUCATION COQUI LLC, | ) | Civil Action No.: 0:26-cv-02255-JFA |
| | ) | |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S RESPONSE IN** |
| | ) | **OPPOSITION TO PLAINTIFF'S** |
| v. | ) | **MOTION FOR TEMPORARY** |
| | ) | **RESTRAINING ORDER AND FOR** |
| 2U, LLC, | ) | **PRELIMINARY INJUNCTION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Defendant 2U, LLC ("2U") files this response in opposition to Plaintiff Higher Education Coqui LLC's ("Plaintiff" or "Higher Ed") Motion for Temporary Restraining Order and for Preliminary Injunction ("Motion"). As set forth below, this Court lacks personal jurisdiction and should deny the Motion for that reason alone. Additionally, Plaintiff has not met its burden on any of the four factors necessary to obtain the extraordinary remedy of a Temporary Restraining Order or Preliminary Injunction. In particular, it has failed to demonstrate that 2U has misappropriated any of Plaintiff's trade secrets or that it would suffer irreparable harm in the absence of this relief. Nor has it established that the equities or public interest are in its favor. Plaintiff is, therefore, not entitled to a temporary restraining order or preliminary injunction.

## BACKGROUND

### I. 2U's Business

2U is a leading education technology company that partners with universities and organizations to support their online degree programs, professional certificates, and open courses. Rodgers Decl. ¶ 3. Through its flagship platform, edX—one of the most recognized names in online learning worldwide—2U connects learners with educational programs from institutions such as Georgetown, UNC Chapel Hill, and MIT. *Id.* 2U's business is to help universities bring their programs online and to connect prospective students with those programs. *Id.*

2U provides the "operational engine" behind these online programs—including technology infrastructure, course design support, marketing and enrollment support services, student support services, and market intelligence and data analytics services—while universities supply the faculty, develop the academic content, set tuition, and make admissions decisions. *Id.* ¶ 4. 2U's learner network spans more than 100 million people, and the edX platform powers thousands of educational offerings worldwide. *Id.*

Prospective students reach 2U's programs through two primary channels: (1) organic traffic, for example by searching Google or other online search engines and clicking on a link to edX.org or another program webpage where they can browse programs and enroll; or (2) paid marketing, whereby users click on paid advertisements that they see on other webpages, social media, sponsored content, etc. *Id.* ¶ 5. On the paid marketing side, when a potential student clicks on an ad for one of 2U's partner programs, they are directed to a "landing page," or a "paid landing page" (PLP) which is a webpage where they can learn more about the program, submit an inquiry for more information or apply to the program. *Id.* These landing pages are a critical entry point to 2U's business, particularly for its degree and executive education offerings. *Id.* Without well-functioning landing pages, prospective students cannot find, learn about, or apply to 2U's partners' programs, 2U's university partners lose enrollments, students cannot access the educational opportunities they are seeking, and 2U's business is directly and immediately harmed. *Id.* Over many years, 2U has developed substantial in-house experience building and managing these webpages to attract and convert prospective students. *Id.*; *see also* Pl.'s Ex. A, SOW 1, Sch. 8 § 6.3.

2U is a Delaware limited liability company headquartered in Arlington, Virginia, with no members in South Carolina. Compl. ¶ 12. It is not licensed to do business in South Carolina, maintains no offices in South Carolina, and has no university partners in South Carolina. *Id.* ¶ 13.

Although eleven of 2U's all-remote employees live in South Carolina, only two are in a typical marketing department function in very junior roles and none is deeply involved in the work that 2U has done with Plaintiff.  *Id.* ¶ 13.

**II.**     **2U Hired Plaintiff to Increase Capabilities on edX.org and Increase Marketing Efficiency on its Degree and Executive Education Landing Pages.**

2U hired Plaintiff, a marketing technology services provider, to help improve 2U's online marketing performance, including the edX.org website and other landing pages.  *See* Compl. ¶ 15. 2U engaged Plaintiff not because it lacked the ability to operate landing pages or the edX.org platform—after all, it had successfully operated these kinds of webpages for years—but because it believed Plaintiff's specialized marketing technology could improve its performance in this area.

In July 2024, 2U and Plaintiff entered into a Master License and Services Agreement (the "Agreement") to govern their partnership.  Compl. ¶ 18.  The Agreement includes two Statements of Work.  Statement of Work #1 ("SOW 1") covers 2U's edX.org marketplace—the main website where learners browse and can purchase courses and programs.  Ex. A SOW 1 § 3.  Under SOW 1, Plaintiff agreed to develop content, provide "search engine optimization" services to help the edX.org website appear more prominently in online search results (for example, appearing at the top of Google search), and provide other "marketplace optimization" services designed to increase the number of prospective students that reach the edX.org website and improve their experiences on that website.  *Id.* SOW 1 §§ 3-4.  Meanwhile, Statement of Work #2 ("SOW 2") covers the landing pages for 2U's partners' degree and executive education offerings that prospective students see after clicking on a paid advertisement.  *Id.* SOW 2 § 3.  Under SOW 2, Plaintiff agreed to design, build, host, and operate these landing pages using its proprietary technology platform. *Id.* SOW 2 § 4(a)(i).

The practical consequence of the Agreement is that Plaintiff now touches a significant portion of the online entry points through which a prospective student reaches a 2U program—whether through an organic search leading to edX.org or through paid advertisements directing traffic to Plaintiff-operated landing pages. *Id.* SOW 1 §§ 3–4; *id.* SOW 2 § 4(a)(i). In other words, Plaintiff controls the many gateways to 2U's student enrollment pipeline by managing the webpages that lead students to 2U's partners' programs. Still, edX.org and the program landing pages are built using 2U content, messaging and program details approved by 2U and its university partners, and branding, imagery, and trademarks from 2U and its university partners. *Id.* SOW 2 § 4(c)(i)–(d); Sch. 8 §§ 2-4; SOW 1, Attachment 1, Sch. 1. In other words, they are 2U's customer-facing products, built using significant 2U and 2U partner intellectual property and hosted on Plaintiff's marketing technology platform. And the Agreement provides that Plaintiff grants 2U a license to use "Developed Creative" (reports, test, content, or related work product in connection with the Services) in addition to all "Red Ventures Retained Intellectual Property" contained in the Developed Creative for any lawful purpose, subject to the condition that 2U does not use that property "to circumvent in any material respect any Statement of Work entered into" pursuant to the Agreement. Ex. A §§ 4(a).

Of course, 2U also retained control of key operations under the Agreement. Among other things, it maintained responsibility for managing school and university partner relationships, determining what educational programs to launch, control over all paid advertisement spending that drive traffic to landing pages, communications with prospective students after they arrived on 2U's landing pages, payment processing, and the learning experience. *Id.* SOW 2 § 4(a)(i); *id.* SOW 1 § 4(b)(ii). 2U also continued to operate landing pages for a number of its programs. Rodgers Decl. ¶ 6; *see also* Ex. A SOW 1, Sch. 8 § 6.3.

The Agreement also includes termination provisions designed to protect 2U from sustained performance issues by Plaintiff. Among other circumstances, the Agreement allows for termination in case of a Critical Service Failure, meaning a "repeated and/or persistent breach" of Plaintiff's obligations to remedy technical malfunctions on the webpages it services. *See id.* §§ 5(b), 7(b), Sch. 7. The Agreement also provides a termination right in case of a Chronic Failure as defined in an applicable Statement of Work. *See id.* § 7(b). In turn, SOW 2 defines a Chronic Failure as a failure to meet a defined performance floor for two consecutive quarters, followed by a one-quarter cure period. *See id.* SOW 2 § 8(c)(iv)(C). The Agreement provides that either party "may terminate . . . if a Critical Service Failure or Chronic Failure . . . occurs." *See id.* § 7(b); *see also id.* SOW 2 § 8(c)(iv). And either party may also terminate if the other party "materially breaches this Agreement" or either SOW, and that breach is incurable or is not cured within thirty days' notice. *Id.* § 7(b).

And the Agreement expressly contemplated that 2U would need to develop alternative landing pages and transition the edX platform back to 2U or another provider if the relationship with Plaintiff ended. It includes an "Exit Assistance" framework, which requires Plaintiff to assist 2U in "effecting the orderly transition of the Services . . . to 2U" after termination of the Agreement, including through transitioning Plaintiff-operated landing pages back to 2U. *Id.* Sch. 5. That framework acknowledges Plaintiff's obligation to "[c]ooperate with 2U to maintain and, where necessary, provide a license in perpetuity to mutually developed intellectual and creative property for the limited purpose of business continuity of the Services." *Id.* Sch. 5 § 3(A)(2). Although this license does not extend to "utiliz[ing] Red Ventures technology" post-termination, the Agreement requires Plaintiff to "assist 2U in identifying an adequate 3rd party solution." *Id.* Sch. 5 § 3(A)(3). Elsewhere in the Agreement, SOW 2 itself provides that, in the event of a Chronic Failure, 2U has the right to "remove underperforming programs / products from Red

5

Ventures-Operated Pages, and instead 2U shall manage such pages." SOW 2 § 8(c)(iv)(C). In short, the Agreement not only anticipated that 2U might need to build and operate its own landing pages—it required the parties to plan for exactly that outcome.

The Agreement includes a provision requiring that all claims arising from the business relationship between 2U and Plaintiff are subject to binding arbitration in the Southern District of New York, applying New York law. Ex. A § 8(d)(ii).

**III.     2U Terminated SOW 2 After Three Quarters of Sustained Non-Performance.**

Plaintiff's performance under SOW 2 flagged beginning shortly after 2U's landing pages were transitioned to Plaintiff. In the first quarter of 2025, Plaintiff missed required performance thresholds under the SOW. *See* Ex. E. It missed them again in the second quarter. *See id.* At that point, 2U initiated remediation efforts to try to address Plaintiff's performance deficiencies. *Id.* But Plaintiff missed its targets in the third quarter too. *Id.* Notably, although the Agreement provided that Plaintiff could submit an "Outside Influence Notice" to seek relief from its performance obligations if it believed that performance deficiencies were caused by certain unanticipated factors beyond its control, *see* Ex. A SOW 2 § 8(c), Plaintiff never sent such notice to 2U. *See* Ex. E. At the same time, Plaintiff's services were marred by repeated technical problems that interfered with customer experience on 2U webpages and caused serious revenue impacts of hundreds of thousands of dollars. *Id.*

After months of these repeated performance failures, 2U took action. In late October 2025, 2U's CEO reached out to Plaintiff's President, noting that results under SOW 2 had "consistently fallen short of expectations and the agreed contractual performance thresholds." Ex. C. He explained that "[i]n light of [Plaintiff's] continued underperformance, [2U] believe[s] it is in both parties' interest to begin planning for an orderly transition of the services provided under SOW #2 back to 2U over the course of 2026." *Id.*

6

In November 2025, 2U formally terminated SOW 2, pursuant to the Agreement's termination provisions. Ex. E. 2U identified Plaintiff's repeated technical performance issues as a Critical Service Failure. *See id.*; Ex. A §§ 5(b), 7(b), Sch. 7. And 2U identified Plaintiff's failure to meet required performance targets for three quarters in a row—even after 2U's efforts to address that failure in the third quarter—as a Chronic Failure under SOW 2. *See* Ex. E; Ex. A § 7(b), SOW 2 § 8(c)(iv). The Agreement authorizes termination "if a Critical Service Failure or Chronic Failure . . . occurs," and 2U invoked its rights under this provision in its termination notice. *See* Ex. E; Ex. A § 7(b), SOW 2 § 8(c)(iv).

## IV. <u>Instead of Providing the Contractually Required Exit Assistance, Plaintiff Filed This Lawsuit and Motion.</u>

After terminating SOW 2, 2U began the process of winding down the parties' relationship in compliance with the Agreement's Exit Assistance framework. *See* Ex. A, Sch. 5. 2U invoked these provisions in its termination notice, indicating that 2U would "work with Red Ventures to expressly memorialize exit assistance scope and structure" and even offered to keep paying Plaintiff under SOW 2 through 2025 to "enable a smooth transition" and "maintain operational stability during the transition period." Ex. E at 4.

Over the next six months, the parties sent competing proposals to facilitate the transition, but the parties' negotiations stalled due to disagreements about the money owed to Plaintiff—and notably not because of any concern about use of Plaintiff's IP. On January 13, 2026, at Plaintiff's CEO's specific request, 2U delivered a comprehensive financial exit proposal that would encompass the wind-down of *both* SOW 1 and SOW 2. *See* Exs. G & K. Plaintiff responded on January 26, 2026 rejecting the exit proposal on the grounds that it was not designed as "a buyout with eight years remaining" on the Agreement's term. Ex. H. On February 19, 2026, Plaintiff reiterated this position, stating that any negotiated resolution "would require that Red Ventures be

7

made whole" for the "full economic value [Plaintiff] reasonably expected to realize over the remaining terms of the Agreement." Ex. L at 2. On May 8, 2026, after further negotiations among the parties, 2U sent an additional proposal. *See* Ex. M. 2U's proposal included revised financial terms providing for significant payments to Plaintiff, notwithstanding the fact that under the Agreement a termination for breach did not entitle Plaintiff to these payments and in fact requires Plaintiff to provide exit assistance at no fee. *Id.* at 3. This proposal also included specific timelines for transitioning off Plaintiff's technology for SOW 1 and transitioning landing pages back to 2U for SOW 2. *Id.* 2U also proposed that "2U-led testing on [these] pages to begin immediately." *Id.* at 3-4.

As it had communicated to Plaintiff, 2U began work to plan for the transition the edX.org website and landing pages back to 2U (projects 2U internally referred to as "Project Boomerang" and "Project Odyssey"). *See* Compl. ¶ 62. This work has taken place in South Africa and the United States—but never in South Carolina. Rodgers Decl. ¶ 7. 2U has eleven remote employees located in South Carolina (out of a global workforce of approximately 1,400 employees). While two of these employees are in junior roles in the marketing department, none of these employees were deeply involved in the partnership with Plaintiff or 2U's efforts to transition the landing pages back to 2U. Rodgers Decl. ¶ 13.

Plaintiff never meaningfully engaged with 2U's May 8, 2026 exit proposal, though the parties were schedule to meet to discuss in on June 9, 2026. But instead—on June 8, 2026— Plaintiff filed this lawsuit and motion focused on alleged misuse of its IP without any prior notice or warning to 2U and unilaterally cancelled the meeting.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Temporary restraining orders and preliminary injunctions are both governed by Federal Rule of Civil Procedure 65 and require a plaintiff to establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Field v. McMaster*, 663 F. Supp. 2d 449, 452 (D.S.C. 2009) (recognizing that "[t]he standard for granting either a TRO or a preliminary injunction is the same"). "The Fourth Circuit no longer recognizes a 'flexible interplay' among these criteria. Instead, each requirement must be fulfilled as articulated."[1] *De La Fuente v. S.C. Dem. Party*, 2016 WL 741317, at *2 (D.S.C. Feb. 25, 2016). Each requirement also must be fulfilled with regard to each claim. It is "unnecessary to address all four factors when one or more ha[s] not been satisfied." *Henderson for Nat'l Labor Relations Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018). But here, Plaintiff does not satisfy a single one.

---

[1] In its Motion, Plaintiff appears to take the position that because it has asserted a claim for misappropriation of trade secrets under New York law based on the choice of law clause in the Agreement, precedent from New York's federal courts and the Second Circuit govern the Court's analysis here. That is largely incorrect. Fourth Circuit precedent governs the entire TRO/preliminary injunction analysis except for the "likelihood of success on the merits" factor, which does require reference to New York law. *See, e.g.*, *Z-Man Fishing Prods., Inc. v. Renosky*, 790 F. Supp. 2d 418, 425 (D.S.C. 2011) ("[P]urely procedural questions involving the grant of a preliminary injunction are controlled by the law of the appropriate regional circuit." (quoting *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988))).

<u>**ARGUMENT**</u>

**V.** <u>**The Court Should Deny Preliminary Injunctive Relief Because The Court Lacks Personal Jurisdiction Over 2U.**</u>[2]

As a threshold matter, the Court should deny Plaintiff's Motion for injunctive relief because the Court lacks personal jurisdiction over Defendant—an out-of-state corporation that is not licensed to do business in South Carolina, has no offices in South Carolina, does not provide services to any schools in South Carolina, and did not perform any of its obligations under the contract in South Carolina. Rodgers Decl. ¶ 13.

"Injunctive relief, by its very nature, can only be granted in an *in personam* action commenced by one party against another in accordance with established process. Consequently, a party cannot obtain injunctive relief against another without first obtaining *in personam* jurisdiction over that person or someone in legal privity with that person." *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 958 (4th Cir. 1999) (citing Fed. R. Civ. P. 65(d)). "When personal jurisdiction is challenged by the defendant, the plaintiff has the burden of showing that jurisdiction exists." *Seithel v. Feldman & Pinto, P.A.*, No. 2:11-CV-1854-PMD, 2011 WL 3924179, at *1 (D.S.C. Sept. 7, 2011) (citing *In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997)). When a court addresses the issue of jurisdiction based on the pleadings and supporting legal memoranda without an evidentiary hearing, the burden is on the plaintiff "to make a prima facie showing of a jurisdictional basis in order to survive the jurisdictional challenge." *Id.* (quoting *Combs v. Bakker*, 886 F.2d 673, 675 (4th Cir. 1989)). But "when injunctive relief is sought, a stronger showing must be made." *Id.* at *1 n.2 (quoting *Catalog Marketing Servs., Ltd. v. Savitch*, 1989 WL 42488, *2

---

[2] 2U was first served with process yesterday, and given limited time, does not yet move for dismissal of the action on the basis of personal jurisdiction, or any other basis, that may be available to it under Rule 12(b) of the Federal Rules of Civil Procedure, and the Court should not construe this Response as doing so. 2U hereby expressly preserves and does not waive any and all bases for dismissal that may be available to it under Rule 12.

(4th Cir. April 24, 1989)). That stronger showing requires demonstrating "that there is at least a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits." *Catalog Mktg. Servs., Ltd. v. Savitch*, 873 F. 2d 1438 (Table), at *2 (4th Cir. 1989).

A federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. Fed. R. Civ. P. 4(k)(1)(A). Thus, "for a district court to validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied. First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and, second, the exercise of personal jurisdiction must also comport with Fourteenth Amendment due process requirements." *Christian Sci. Bd. of Dirs. of First Church of Christ, Sci. v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). "South Carolina's long-arm statute has been interpreted to reach the outer bounds permitted by the Due Process Clause. Consequently, the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997) (internal citations and quotation marks omitted). The central question the Court must address is whether the defendant has established "minimum contacts" with the forum "such that . . . maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 942 (4th Cir. 1994) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). To meet this burden, Plaintiff must demonstrate that non-resident 2U is subject to either general or specific jurisdiction in South Carolina.

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011) (internal quotation marks omitted). "Specific jurisdiction, on the other hand, depends

11

on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (internal quotation marks and brackets omitted).

### a. <u>Plaintiff Has Not Established General Jurisdiction Over 2U.</u>

Due Process requires that a corporation be "at home" in the forum seeking to exert general jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 136, 134 S. Ct. 746, 760, 187 L. Ed. 2d 624 (2014). A corporation is unequivocally "at home" in only two places: its "place of incorporation and principal place of business . . . ." *Id.* at 137, 134 S. Ct. at 760, 187 L. Ed. 2d 624. In other words,

> [t]he "paradigm" forums in which a corporate defendant is "at home," we explained, are the corporation's place of incorporation and its principal place of business. *Daimler*, 571 U.S., at 137, 134 S.Ct., at 760; *Goodyear*, 564 U.S., at 924, 131 S.Ct. 2846. The exercise of general jurisdiction is not limited to these forums; in an "exceptional case," a corporate defendant's operations in another forum "may be so substantial and of such a nature as to render the corporation at home in that State." *Daimler*, 571 U.S., at 139, n. 19, 134 S.Ct., at 761, n. 19.

*BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413, 137 S. Ct. 1549, 1558, 198 L. Ed. 2d 36 (2017).

From a general jurisdiction perspective, 2U could only be considered "at home" in Delaware (its place of incorporation) and Virginia (where it is headquartered and has its principal place of business). Neither Plaintiff's Complaint nor its Motion support the notion that this is an "exceptional case," as Plaintiff does not allege that 2U's operations are so substantial outside of Delaware and Virginia that 2U can be considered "at home" in South Carolina for purposes of general jurisdiction. Nor could it. Plaintiff admits in its Complaint that "none of [2U's] members . . . are located in . . . South Carolina," Compl. ¶ 12, and 2U does not maintain any physical presence or meaningful employee base in the state, Rodgers Decl. ¶ 13.

For these reasons, general jurisdiction cannot be exercised over 2U within the confines of Due Process.

**b. Plaintiff Has Not Established Specific Jurisdiction Over 2U.**

It would likewise be improper to exercise specific jurisdiction over 2U. In order for a court to exercise specific jurisdiction, "the *suit* must arise out of or relate to the defendant's contacts with the *forum*"—and this one does not, given 2U's lack of contacts with South Carolina and lack of relevant conduct in or directed toward South Carolina. *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262, 137 S. Ct. 1773, 1780, 198 L. Ed. 2d 395 (2017) (internal quotation marks and brackets omitted) (emphasis in original). "[T]he constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528 (1985). 2U must have done "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 209 L. Ed. 2d 225, 141 S. Ct. 1017, 1024 (2021) (citation omitted). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts . . . ." *Burger King Corp.*, 471 U.S. at 475, 105 S. Ct. at 2183, 85 L. Ed. 2d 528.

The Fourth Circuit applies a three-part test when evaluating the appropriateness of exercising specific jurisdiction: (1) whether and to what extent the defendant "purposely availed" itself of the privileges of conducting activities in the forum state, and thus invoked the benefits and protections of its laws; (2) whether the plaintiff's claim arises out of those forum-related activities; and (3) whether the exercise of jurisdiction is constitutionally "reasonable." *Christian Sci. Bd. of Directors*, 259 F.3d at 216. To satisfy Due Process, Plaintiff must satisfy all three prongs. That means that if Plaintiff cannot satisfy the first prong of the test, the Court need not "move on to a

consideration of prongs two and three." *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009). Here, however, Plaintiff has pled no facts to satisfy any of these required elements. Accordingly, the exercise of specific jurisdiction over 2U would violate Due Process.

The personal jurisdiction analysis here fails at the threshold because Plaintiff has not pled that 2U purposefully availed itself of the privilege of conducting business in South Carolina. While this requirement is not susceptible to mechanical application, *see Int'l Shoe,* 326 U.S. at 319, 66 S. Ct. at 159; *Kulko v. Superior Court*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978), courts have considered various nonexclusive factors in seeking to resolve whether a defendant has engaged in such purposeful availment.

In the business context, these factors include, but are not limited to:

- whether the defendant maintains offices or agents in the forum state;
- whether the defendant owns property in the forum state;
- whether the defendant reached into the forum state to solicit or initiate business;
- whether the defendant deliberately engaged in significant or long-term business activities in the forum state;
- whether the parties contractually agreed that the law of the forum state would govern disputes;
- whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship;
- the nature, quality and extent of the parties' communications about the business being transacted; and
- whether the performance of contractual duties was to occur within the forum.

*Consulting Engineers Corp.*, 561 F.3d at 278 (internal citations omitted).

Plaintiff has plainly failed to plead with any specificity any facts suggesting that 2U purposefully availed itself of the privilege of conducting business in the state under these factors.

Plaintiff does not allege that 2U performed any part of its obligations under the contract in South Carolina, provides services to any educational institutions in South Carolina, or maintains any offices in South Carolina—nor could it. Rodgers Decl. ¶ 13. Plaintiff's Complaint and Motion are devoid of any specific allegations tying 2U's conduct to the state of South Carolina and do not explain how the claims in this case arise out of or relate to those contacts. In fact, Plaintiff's *only* mention of personal jurisdiction is found in paragraph 14 of its Complaint where it alleges in conclusory fashion, "Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated in South Carolina"—without ever mentioning anything that actually occurred here. Compl. ¶ 14.

The Complaint goes into no further detail and omits critical allegations that could demonstrate which of those vague "events or omissions" giving rise to Plaintiff's claims occurred in South Carolina. The law is well settled in this District that wholly conclusory allegations of personal jurisdiction exactly like this one are entirely insufficient to carry Plaintiff's burden of demonstrating a prima facie case of personal jurisdiction. *See, e.g.*, *E.E. by & through Epsey v. Eagle's Nest Found.*, 200 F. Supp. 3d 626, 630 (D.S.C. 2016) ("[A] court 'need not credit conclusory allegations or draw farfetched inferences [of personal jurisdiction].'" (quoting *Sonoco Prods. Co. v. ACE INA Ins.*, 877 F.Supp.2d 398, 404-05 (D.S.C. 2012))); *Sheppard v. Jacksonville Marine Supply, Inc.*, 877 F.Supp. 260, 264 (D.S.C. 1995) ("While plaintiffs' written allegations of jurisdictional facts are generally construed in their favor, their showing of personal jurisdiction must be based on specific facts set forth in the record in order to defeat defendants' motion to dismiss.") (quotation omitted).

Given that Plaintiff has not alleged a single specific contact between 2U and the State of South Carolina, this Court should find that 2U has not purposefully availed itself of the privilege

of conducting business in South Carolina.[3]  Consistent with that finding, the Court should deny

Plaintiff's Motion because the exercise of specific jurisdiction over it would not comport with Due

Process.

**VI.    <u>Plaintiff Has Not Established a Likelihood of Success on the Merits and Preliminary Injunctive Relief is Not Warranted.</u>**

Plaintiff filed a Complaint seeking injunctive relief and damages, claiming that 2U wrongfully misappropriated Plaintiff's trade secrets and confidential information.  Compl. ¶¶ 1–2. Plaintiff's allegations relate to the ongoing contractual business relationship between Plaintiff and Defendant pursuant to the Agreement, under which Plaintiff agreed to provide technology and marketing services to 2U.  The Complaint purports to assert causes of action for (1) violations of the federal Defend Trade Secrets Act, 18 U.S.C. § 1839 *et seq.* ("DTSA"), (2) misappropriation of trade secrets under New York law, and (3) Temporary Restraining Order, Preliminary and Permanent Injunction.  However, Plaintiff's Motion and supporting memorandum fail to establish that it is likely to succeed on the merits of its claims, and it is therefore not entitled to a temporary restraining order or preliminary injunction.

To prevail on a claim of trade secrets misappropriation under the DTSA, a plaintiff must show that it is "(1) an owner of a trade secret; (2) the trade secret was misappropriated; and (3) the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *Brainwave Sci., Inc. v. Arshee, Inc.*, No. 21-CV-4402 (BMC), 2021 WL 6211630, at *2 (E.D.N.Y. Dec. 14, 2021) (citing 18 U.S.C. § 1836(b)(1)); *see also IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224, 238 (E.D.N.Y. 2024). Similarly, under New York law, a plaintiff claiming misappropriation of trade secrets must prove that "(1) it possessed a trade secret, and (2)

---

[3] Because Plaintiff has failed to allege any specific contacts with South Carolina, neither 2U nor the Court is armed with the necessary information to proceed to the remaining two prongs of the specific personal jurisdiction analysis, relatedness and reasonableness. It is not possible to determine whether Plaintiff's claims in this case relate to or arise out of 2U's contacts with this state when Plaintiff has not alleged what those contacts are.  Regardless, because Plaintiff must satisfy all three prongs, its failure of proof under prong one precludes the exercise of jurisdiction even without engaging with the other prongs. *See Consulting Engineers Corp.*, 561 F.3d at 278.

the trade secret was used by defendant in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *IME Watchdog, Inc.*, 732 F. Supp. 3d at 238 (quoting *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 339 (E.D.N.Y. 2020)). The elements of a misappropriation claim under New York law are fundamentally the same as those under § 1836, and courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims. *See Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020).

Under the DTSA, the term "trade secret" means:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
>
> > (A) the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).[4] "Misappropriation" means:

> > (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;[5] or

---

[4] Under New York law, six factors are considered when determining whether specific information is a trade secret: "(1) The extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *IME Watchdog*, 732 F. Supp. 3d at 239.

[5] The term "improper means" is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" and "does not include reverse engineering, independent derivation, or any other lawful

17

(B) disclosure or use of a trade secret of another without express or implied consent by a person who--

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that--

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake[.]

*Id.* § 1839(5).

### A. Plaintiff Has Failed to Define its Purported Trade Secrets With Sufficient Particularity.

In its Motion, Plaintiff argues that the software, source code, and strategic tools at issue in its Complaint and Motion satisfy the definition of a trade secret under the DTSA and New York law because Plaintiff took reasonable measures to preserve the secrecy of its trade secrets, and its trade secrets have independent economic value. Motion at 9–14. Plaintiff alleges that it "utilizes at least 35 trade secrets to provide its services to 2U under SOW 1 and 2" and attached a list of those thirty five (35) purported trade secrets (the "Purported Trade Secrets") as Exhibit B to its Complaint, which was filed under seal and which 2U did not receive from opposing counsel until after 3:00 PM Eastern on June 10, 2026, the day before the scheduled hearing. Compl. ¶ 30.

_____

means of acquisition." 18 U.S.C. § 1839(7).

However, Plaintiff has failed to satisfy its threshold statutory burden of establishing that the Purported Trade Secrets are, in fact, trade secrets. *Glob. Consulting USA LLC v. Pinnacle Risk Eng'g, LLC*, No. 2:24-CV-04919-DCN, 2025 WL 329664, at *4 (D.S.C. Jan. 29, 2025) ("[B]efore [the plaintiff] can show that defendants misappropriated a trade secret, or threatened to do so, it must first establish the existence of a trade secret."). Plaintiffs alleging trade secret misappropriation under the DTSA are required to "identify 'with sufficient particularity' the trade secret it claims has been misappropriated." *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025). "At the pleading stage, identifying the trade secret with sufficient particularity means describing the trade secret at a level of detail that enables "a defendant to delineate that which he is accused of misappropriating" and "that enables a court to determine whether the plaintiff has plausibly satisfied the reasonable secrecy and independent economic value requirements."[6] *Id.* (citations omitted). "Neither the defendant nor the court should be forced into a fishing expedition to find evidence of a valid trade secret in the pleadings." *Id.*

For example, in *Sysco*, the Fourth Circuit held that the plaintiff's alleged trade secrets consisting of "Sysco's compilation of machinery, software, and confidential information," "Sysco's proprietary and confidential information, including the Copyrighted Works, and technical, financial, operations, strategic planning, product, pricing vendor, and customer information" and "technical documents, test videos, statistical data, client contracts, and other confidential information used by Sysco to develop and manufacture" rotary die cutting machines

---

[6] *See also Lowndes Prods., Inc. v. Brower*, 259 S.C. 322, 329, 191 S.E.2d 761, 765 (1972) (per curiam) (noting that the plaintiff bears the burden of proving the existence of a trade secret to prevail on a trade secrets claims); *see also Am. Registry, LLC v. Hanaw*, 2013 WL 6332971, at *3 (M.D. Fla. Dec. 5, 2013) (emphasis added) (quoting *Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1286 (S.D. Fla. 2010)) ("'A plaintiff has the burden to describe the alleged trade secret with reasonable particularity.'"); *Bite Tech, Inc. v. X2 Impact, Inc.*, No. C12-1267RSM, 2012 WL 13018749, at *3 (W.D. Wash. Dec. 21, 2012) ("To withstand a motion to dismiss, the alleged trade secrets must be more than vague descriptions."); *Int'l Acad. of Bus. & Fin. Mgmt., Ltd. v. Mentz*, No. 12-cv-00463-CMA-BNB, 2013 WL 212640, at *9 (D. Colo. Jan. 18, 2013) (quoting *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 522 (Colo. App. 2011)) ("A party alleging misappropriation of a trade secret must produce evidence 'of the specific types of confidential information ... with sufficient particularity to identify the existence of its claimed trade secrets.'").

were the exact type of "sweeping and conclusory" claims that rendered it impossible for the defendant in that case "to know what it has been accused of misappropriating or for the court to assess whether Sysco has met the reasonable secrecy and independent economic value requirements" and that if all of those definitions constitute trade secrets "nearly Sysco's entire business is a trade secret." *Id.* at 229.

So too here. The Purported Trade Secrets are not, as defined by Plaintiff in Exhibit B to its Complaint, stated with sufficient particularity to enable 2U to know what it has been accused of misappropriating or for the Court to assess whether Plaintiff has met the reasonable secrecy and independent economic value requirements. Further, even if the Court determines that Plaintiff has defined these Purported Trade Secrets with the requisite degree of particularity, the vast majority (at least twenty five) of those Purported Trade Secrets are simply industry-wide standard marketing practices, tactics, or know-how that are not unique to Plaintiff or 2U and thus cannot possibly constitute Plaintiff's trade secrets. See Rodgers Decl. ¶¶ 9-12.

## B. Plaintiff Has Failed to Demonstrate That 2U Has Misappropriated Trade Secrets.

Even if the Court finds Plaintiff has met its threshold burden of showing the existence of trade secrets under the DTSA and New York law, it has not demonstrated that 2U has misappropriated, or is even threatening to, misappropriate any of them. "After demonstrating the existence of a valid trade secret, 'a plaintiff must show that the defendant has misappropriated it.'" *Sysco*, 143 F.4th at 229 (quoting *AirFacts, Inc. v. de Amazega*, 909 F.3d 84, 95 (4th Cir. 2018)). Misappropriation involves "acquisition," "disclosure," or "use" of a trade secret by "improper means" or "without consent." *Id.* (citing 18 U.S.C. § 1839(5)).

Here, however, other than the Purported Trade Secrets that appear to describe nothing more than general marketing industry concepts, from what 2U can tell from Plaintiff's vague descriptions of the other remaining Purported Trade Secrets, it has either never seen, does not have access to, and/or could not even use if it wanted to, the Purported Trade Secrets listed on Plaintiff's Exhibit B. Rodgers Decl. ¶¶ 9-12.

20

Therefore, because Plaintiff has failed to meet its burden of establishing a likelihood of success on the merits for any of its claims, its request for temporary and preliminary injunctive relief must be denied.

**VII.**     **Plaintiff Has Not Satisfied its Burden to Make a Clear Showing That it Is at Risk of Irreparable Harm**

The party seeking injunctive relief must make a "clear showing that it is at risk of irreparable harm, which entails showing a likelihood of substantial and immediate irreparable injury." *Apple, Inc. v. Samsung Electronics Co.*, Ltd, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (quoting *Winter*, 555 U.S. at 22 and *O'Shea v. Littleton*, 414 U.S. 488 (1974)) (internal citation and quotations omitted). "[H]arm is not 'irreparable' if it can be compensated by money damages." *Person v. Mayor and City Council of Baltimore*, 437 F.Supp.2d 476, 479 (D.Md. 2006) (citing *Hughes Network Sys. v. InterDigital Comm. Corp.*, 17 F.3d 691, 693 (4th Cir. 1994)). Accordingly, where a party fails to show that legal remedies are inadequate, it cannot establish irreparable harm. *See Giannoukos v. Harp*, 369 F.Supp.2d 715, 719 (E.D. Va. 2005) ("The failure of Plaintiff to show a likelihood of actual imminent irreparable harm, is itself a sufficient basis for a denial of her Motion for Preliminary Injunction.") (*citing Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997)); *see also Koosharem Corporation v. Fuston*, No. 6:08-583-HFF-WMC, 2009 WL 10678243, *3 (D.S.C Feb. 24, 2009) ("It is a general rule in equity that to be entitled to equitable relief such as a preliminary injunction, the party seeking relief must establish that legal remedies are inadequate to compensate for the injury.") (citing *eBay Inc. v. MercExchange*, L.L.C, 547 U.S. 388, 391 (2006)).

Plaintiff fails to meet this standard. As an initial matter, its irreparable harm theory rests on an unsupported risk of dissemination of its alleged trade secrets. Yet its own allegations are speculative and based only on statements "upon information and belief" that 2U "has made unauthorized disclosures" or "engaged a third-party vendor," without identifying any concrete instance of actual or imminent disclosure. Compl. ¶¶ 58, 87.

Nor do Plaintiff's allegations describe any imminent loss of secrecy. To the contrary, the Complaint repeatedly alleges that 2U is "replicat[ing]" or "rebuild[ing]" systems using information to which it had access under the Agreement, not that it is publicly disclosing trade secrets in a manner that would destroy their secrecy. *Id.* at ¶¶ 1, 4, 59, 61, 70, 71, 72, 75, 107. That is, at most, a dispute over use of information within an ongoing business relationship.

Plaintiff's alleged harm is therefore purely economic. It claims that 2U is diverting user traffic from Plaintiff-operated landing pages, thereby reducing "traffic, data, and revenue." *Id.* at ¶ 3. That is a classic lost-profits theory–one that is readily quantifiable and fully compensable through money damages. Courts in this Circuit routinely deny injunctive relief in these circumstances, including in trade secret cases where the defendant is merely attempting to "replicate the manner in which" the plaintiff operates its business. *See Ameritox, Ltd. V. Savelich*, 92.F.Supp.3d 389, 402–04 (D.Md. 2015) (finding that, even where the plaintiff demonstrated a likelihood of success on a trade secret misappropriation claim, preliminary injunctive relief was unwarranted because the alleged harm was compensable by money damages where an entity was merely attempting to "replicate the manner in which" the plaintiff "buys and organizes its customer information"); *see also FMC Corp. v. Cyprus Foote Mineral Co.*, 899 F. Supp. 1477, 1484 (W.D.N.C. 1995) (finding no likelihood of irreparable harm in misappropriation of trade secrets action even when damages would be "difficult to calculate"); *Microban International, Ltd. v. Kennedy*, No. 3:22-CV-00620-KDB-DSC, 2023 WL 2533085, \*5 (W.D.N.C. Mar. 15, 2023) (finding no likelihood of irreparable harm in misappropriation of trade secrets action when the plaintiff relied on the "mere possibility" that the defendant would "inevitably use, disclose, and misappropriate confidential information and trade secrets"). Here, where 2U has over a decade of experience successfully operating numerous ecommerce websites and landing pages, it is not surprising that 2U could build a website and landing pages without using Plaintiff's proprietary technology.

Because Plaintiff's alleged injury can be fully remedied by money damages, it cannot establish irreparable harm. Plaintiff's motion should be denied.

**VIII.** <u>**The Balance of Equities Does Not Tip in Favor of Plaintiff.**</u>

In determining the balance of hardships, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amer. Whitewater v. Tidwell*, 2010 WL 5019879, at *13 (D.S.C. Dec. 2, 2010). Contrary to Plaintiff's contention, given that numerous of the Purported Trade Secrets describe industry standard marketing activities, 2U will suffer significant financial harm if the Court grants the injunctive relief Plaintiff seeks because it would effectively be forced to cease certain essential revenue generating activity outside of Plaintiff's scope that relies on the information, programs, and other materials that Plaintiff claims are trade secrets and that Plaintiff now asks the Court to sequester. In addition, 2U may be required to cease its internal planning activities related to insourcing the services covered by SOW 1 and SOW 2. Given Plaintiff's significant underperformance and 2U's termination of SOW 2 due to breach, it would be detrimental to 2U's business were it unable to employ industry standard marketing tactics as it plans how to absorb the services Plaintiff has been performing. *See, e.g.*, *PCS Wireless LLC v. A to Z Wireless Sols. Inc.*, 841 F. Supp. 2d 649, 654 (E.D.N.Y. 2012) (finding balance of hardships tilted in favor of business defendant where defendant asserted it cannot conduct its ordinary business if the preliminary injunction issued); *Builder Servs. Grp., Inc. v. Pick*, No. 3:09-cv-255, 2009 WL 10715644, at *3 (M.D. Pa. Feb. 12, 2009) ("[R]elief . . . will effectively put the defendant corporation out of business . . . This loss is much more tangible and quantifiable than the plaintiff's claim of loss of profits or customers . . . The balance of the equities therefore[ ] weighs heavily in favor of the defendants."). Therefore, Plaintiff has failed to establish that the balance of equities tips in its favor, and preliminary injunctive relief must be denied.

**IX.** <u>**A Preliminary Injunction Is Not in the Public Interest.**</u>

Last, the Court should deny Plaintiff's Motion because the relief requested therein would not benefit any public interest. While trade secrets are allegedly at issue, those Purported Trade Secrets, if any (see discussion above), were acquired (if at all) pursuant to the parties' Agreement, a private and confidential contract between two sophisticated businesses. *See, e.g.*, *Synthes USA,*

*LLC v. Davis*, No. 4:17-CV-02879-RBH, 2017 WL 5972705, at *9 (D.S.C. Dec. 1, 2017) ("The public interest does not weigh heavily in this case, given that the interests at issue are mainly private."). Further, 2U provides substantial economic benefits to the public at large by partnering with educational institutions to help offer online educational courses, an effort that will be greatly hindered if the Court grants Plaintiff's requested relief. *See Nucor Corp. v. Bell*, No. 2:06-CV-02972-DCN, 2008 WL 9894350, at *23 (D.S.C. Mar. 14, 2008) (considering the "economic well-being of" the "hundreds of people and countless others [who have] business relationships with [the defendant]."). The public interest factor therefore favors 2U.

**X.      Plaintiff Incorrectly Characterizes the Relief it Seeks as a Prohibitory Injunction to Preserve the Status Quo.**

Prohibitory preliminary relief preserves the status quo during the pendency of litigation to prevent irreparable harm. *George Sink, P.A. Injury Lawyers v. George Sink II Law Firm, LLC*, 407 F.Supp.3d 539, 549 (D.S.C. 2019). In contrast, a mandatory injunction alters the status quo and is "warranted only in the most extraordinary circumstances." *NAACP v. City of Myrtle Beach*, 383 F.Supp.3d 603, 609 (D.S.C. 2019). The status quo for purposes of preliminary injunctive relief is the "last uncontested status between the parties which preceded the controversy," not the conditions that Plaintiff now seeks to impose through this litigation. *Stemple v. Bd. of Ed. of Prince George's Cnty.*, 623 F.2d 893, 898 (4th Cir. 1980).

Here, the parties operated without dispute until Plaintiff's belated accusations of misappropriation. Even as the relationship deteriorated due the Plaintiff's sustained performance failures, both sides proceeded under the Agreement toward negotiating an orderly transition. The Agreement expressly contemplated that transition and 2U acted consistently with those obligations. Plaintiff now asks the Court to halt and reverse that transition, imposing new restrictions that did not exist during the parties' pre-dispute conduct. That is not preserving the status quo–it is altering it. Accordingly, Plaintiff fails to show that this case presents the extraordinary circumstances required for a mandatory preliminary injunction, and its motion should be denied.

## CONCLUSION

For the foregoing reasons, Defendant 2U respectfully requests that this Court deny Plaintiff's Motion for Temporary Restraining Order and for Preliminary Injunction.

Respectfully submitted this 11th day of June, 2026.

/s/ *Robert H. Brunson*
Robert H. Brunson (Fed. Bar No. 4971)
E-Mail: robert.brunson@nelsonmullins.com
John P. Bozeman (Fed. Bar No. 13865)
E-Mail: john.bozeman@nelsonmullins.com
Stephen Q. Mann (Fed. Bar. No. 14540)
E-Mail: quinn.mann@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
151 Meeting Street, Suite 600
Charleston, SC 29401
Telephone: (843) 534-4226

*Attorneys for Defendant 2U, LLC*